**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equity Recovery Specialists LLC, | No. CV-21-01889-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Select Portfolio Servicing Incorporated, et al., | |
| Defendants. | |

## INTRODUCTION

In December 2020, Plaintiff Equity Recovery Specialists, LLC ("Plaintiff") bought a parcel of real estate for just over $16,000 at a public auction.  The property had been abandoned by its previous owner, who stopped making mortgage payments or paying homeowners' association ("HOA") fees in 2012.  The auction arose after the HOA sued the previous owner to recover the overdue HOA fees, obtained a default judgment, and forced the property sale to satisfy the judgment.

The property was encumbered by a deed of trust ("DOT") in favor of Deutsche Bank National Trust Company ("Deutsche Bank").  The DOT secured a $160,000 home loan that had been extended to the previous owner by Deutsche Bank's predecessor-in-interest.  However, Deutsche Bank and its loan servicer, Select Portfolio Servicing, Inc. ("SPS") (together, "Defendants"), had not taken any steps following the 2012 abandonment to collect on the overdue mortgage payments.  After the auction, the property remained encumbered by the DOT.

In March 2021, Plaintiff sent a letter to SPS.  After identifying various reasons why (in Plaintiff's view) Defendants would be legally barred from attempting to collect on the underlying loan or enforce the DOT, the letter stated: "[Plaintiff] would prefer to reach an amicable resolution as to all issues arising out of or relating to the Loan as opposed to litigating these contested issues.  Enclosed herewith is a check for $10,000 offered in accord and satisfaction for you to release the DOT.  *See* A.R.S. § 47-3311.  *Depositing the enclosed check will be deemed an acceptance of this offer.*"  (Doc. 11 at 56.)  SPS, in turn, endorsed and deposited the $10,000 check that was enclosed with the letter but informed Plaintiff that it had applied the proceeds to the outstanding loan balance.

Nevertheless, Plaintiff interpreted SPS's conduct as proof that the offer in the March 2021 letter had been accepted (and that the property was no longer encumbered by the DOT).  Afterward, Plaintiff took out a hard money loan to develop the property, engaged in renovations, and eventually sold the property for over $320,000 to a third-party buyer.  Plaintiff guaranteed the sale with a warranty deed.  Defendants have since refused to release the DOT, arguing among other things that SPS's act of cashing the $10,000 check did not serve as acceptance of the offer in the March 2021 letter.

In this lawsuit, Plaintiff seeks a judicial determination that Defendants must release the DOT, as well as unspecified damages.  Plaintiff's overarching theory is that, by cashing the $10,000 check that was enclosed with the March 2021 letter (which stated that the check was in exchange for releasing the DOT), Defendants accepted the offer and formed a binding contract that they must honor.

Now pending before the Court are the parties' cross motions for summary judgment.  (Docs. 47, 48.)  For the following reasons, both motions are denied but Defendants are granted leave to file a successive summary judgment motion on the issue of preemption.

…

…

…

…

## RELEVANT BACKGROUND

I.   <u>Preliminary Matters</u>

Each side raises objections to portions of the other side's summary judgment submissions.  Because these objections bear on whether several key facts are genuinely disputed, the Court begins there.

### A.   **Factual Assertions Supported Only By Citations To The Complaint**

Plaintiff's summary judgment motion contains a statement of facts.  (Doc. 48 at 6-10.)  To substantiate many of the asserted facts in this portion of the motion, Plaintiff cites exhibits that were filed as attachments to the motion.  (*Id.*)  However, in some instances, the sole source of support is a citation to the First Amended Complaint ("FAC").  (*Id.*)

Defendants object to this approach under Rule 56(c), arguing that they "object to the factual background set out by Plaintiff . . . to the extent that it incorporates allegations from the [FAC] that Plaintiff has failed to support with admissible evidence."  (Doc. 52 at 3.)  Specifically, Defendants identify the following four factual assertions in Plaintiff's motion as unsupported:

> (1) "SPS is the only party charged by Deutsche with enforcement of the DOT, protection of the beneficiaries' financial interests and to communicate with the trust."
>
> (2) "SPS is the only entity authorized to accept payments or communicate with Deutsche under one or more loan servicing agreement(s) by the authority and extent as alleged in the DOT."
>
> (3) "As the result of acceptance and endorsement of the tendered check under the terms of the First Letter, Defendants became obligated to release the DOT."
>
> (4) "Defendants are in breach of their obligation to release the lien arising out of the contact [sic] formed expressly, or by implication through their actions."

(*Id.* at 3-4.)

In reply, Plaintiff contends: "These objections should be overruled as the verbiage is superfluous.  Defendants' witness, Michelle Simon, testifies that: Deutsche was the trustee for the loan and that servicing of the loan was transferred from SunTrust to SPS. Extensive SPS activity is described in servicing the account for Deutsche.  The exclusivity

allegations are immaterial as Deutsche is the trustee and SPS serviced the account." (Doc. 56 at 5.) In support of this contention, Plaintiff cites paragraphs 10 and 16 of one of the declarations that Defendants attached to their motion. (*Id.*) There, an SPS representative, Michelle Simon (the admissibility of whose testimony is addressed in later portions of this order), made the following assertions: (1) "Deutsche Bank National Trust Company, as Trustee, in trust for registered Holders of GSAA Home Equity Trust 2007-2, Asset-Backed Certificates, Series 2007-2 is the current noteholder" (Doc. 47-3 at 4 ¶ 10); and (2) "On December 1, 2018, SPS took over as the servicer of the Loan on behalf of Deutsche Bank. *See* Notice of Servicing Transfer dated November 28, 2018, a complete and authentic copy of which is attached hereto as Exhibit 4, which is maintained by SPS among the Loan Records in the normal course of business." (Doc. 47-3 at 4 ¶ 16).

Defendants' objections are well-taken. As an initial matter, although Plaintiff asks for the objections to be "overruled," it is not clear that Plaintiff actually seeks to defend the sufficiency of the evidentiary foundation for at least some of the challenged factual assertions. Rather, Plaintiff appears to view the challenged factual assertions as "superfluous" and "immaterial" to the summary judgment analysis. If so, it's unclear why Plaintiff would have any quarrel with Defendants' objections being sustained.

Even assuming that Plaintiff does, in fact, oppose the objections, Defendants are entitled to relief on the merits. It was Plaintiff's burden to substantiate the factual assertions appearing in its motion by "citing to particular parts of materials in the record, including depositions, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answer, or other materials." *See* Fed. R. Civ. P. 56(c)(1)(A). Cross-references to allegations in the complaint do not suffice. *See, e.g.*, *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1166 (N.D. Cal. 2014) ("[A]llegations in a complaint are not evidence that can be used to support or oppose summary judgment."). Thus, on their face, the challenged factual assertions are deficient and the Court may disregard them for summary judgment purposes. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Finally, even assuming it might be permissible for a summary judgment movant to remedy this sort of omission by belatedly identifying, in its reply brief, evidence that supports the factual assertions contained in the motion, Plaintiff has not done so here—the cross-referenced paragraphs from the Simon declaration fail to substantiate the four challenged factual assertions.  Therefore, the Court does not consider those assertions for purposes of summary judgment.

**B.    McCaffrey And Simon**

As noted, one of the exhibits attached to Defendants' summary judgment motion is a declaration from SPS employee Michelle Simon.  (Doc. 47-3 at 2-12.)  In its response brief, Plaintiff characterizes Simon as "an undisclosed corporate legal affairs insider" and argues that Defendants' production of the Simon declaration thus amounts to "an ambush."  (Doc. 50 at 18-19.)  Plaintiff further contends that, as a remedy for this ambush, it was entitled to "hire an expert for rebuttal."  (*Id.* at 19.)  To that end, attached as an exhibit to Plaintiff's response brief is a declaration from William McCaffrey, who identifies himself as "a Consultant for Housing Mortgage Consultants, Inc." who is qualified "to render opinions on [certain] topic areas," including "the securitization of mortgage loans."  (*Id.* at 35-37.)  In their reply, Defendants move to strike McCaffrey's declaration and to disregard all of the references in Plaintiff's brief to the McCaffrey declaration, arguing that "Plaintiff's disclosure of Mr. McCaffrey as an expert and fact witness is untimely and violates the Court's Case Management Order and Rule 26."  (Doc. 55 at 1-2.)

The starting point for analyzing Defendants' challenge to the McCaffrey declaration is Rule 26(a) of the Federal Rules of Civil Procedure.  Under Rule 26(a)(1)(A)(i), which deals with the disclosure of fact witnesses, "a party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Meanwhile, Rule 26(a)(2)(D), which is entitled "Time to Disclose Expert Testimony," provides that "[a] party must make [required

expert] disclosures at the times and in the sequence that the court orders."

Rule 37(c)(1) specifies the consequences for violating Rule 26(a)'s duties of disclosure. It provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." *Id.* This rule "'gives teeth' to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed." *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011), *superseded by rule on other grounds as recognized in Shrader v. Papé Trucks, Inc.*, 2020 WL 5203459, *2 n.2 (E.D. Cal. 2020). *See also Liberty Ins. Co. v. Brodeur*, 41 F.4th 1185, 1191 (9th Cir. 2022) (one of the sanctions authorized by Rule 37(c)(1) is that "when a witness is not disclosed by a party then, as a sanction, that witness cannot testify").

"The party requesting sanctions [under Rule 37] bears the initial burden of establishing that the opposing party failed to comply with the [applicable] disclosure requirements." *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 241 (D. Nev. 2017). If the movant makes this showing, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Liberty Ins. Corp.*, 41 F.4th at 1190. When evaluating substantial justification and harmlessness, courts often consider (1) prejudice or surprise to the other party; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) willfulness or bad faith. *Id.* at 1192.

"Rule 37(c)(1) is an 'automatic' sanction that prohibits the use of improperly disclosed evidence," such that "litigants can escape the 'harshness' of exclusion only if they prove that the discovery violations were substantially justified or harmless." *Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 740 (9th Cir. 2021) (citation omitted). Nevertheless, "[t]he automatic nature of the rule's application does not mean that a district court must exclude evidence that runs afoul of Rule 26(a) or (e). . . . Rather, the rule is automatic in the sense that a district court may properly impose an exclusion sanction

where a noncompliant party has failed to show that the discovery violation was either substantially justified or harmless." *Id.* (citation omitted). The "party facing sanctions under [Rule 37(c)(1)] bears the burden of showing that a sanction other than exclusion is better suited to the circumstances." *Id.* at 741. "[A] noncompliant party must 'avail himself of the opportunity to seek a lesser sanction' by formally requesting one from the district court." *Id.* (citation omitted).

Here, the first part of the analysis is straightforward—Plaintiff violated its disclosure obligations under Rule 26(a) in relation to McCaffrey. Under the scheduling order, expert disclosures were due by the end of December 2022 and fact discovery closed on January 6, 2023. (Doc. 35 at 2-3.) Nevertheless, Plaintiff first disclosed McCaffrey as a potential fact and expert witness on March 6, 2023, via Plaintiff's Second Supplemental Disclosure Statement:

> Mr. McCaffrey is a rebuttal factual witness to Michelle Simon or any other SPS witness concerning SPS' general business practices and procedures and/or the reporting and accounting history of the subject loan and/or the general business practices and procedures of loan servicers and/or reporting and accounting practices. Mr. McCaffrey will rebut the conclusions implied in the declaration testimony of lay witness Michelle Simon as untrustworthy and misleading for those outside the loan servicing industry. Mr. McCaffrey will testify consistently with his declaration that is disclosed herewith. Mr. McCaffrey is also disclosed as an expert witness for the subject of residential home loan servicing by companies such as SPS.

(Doc. 55-1 at 9, emphasis omitted. *See also* Doc. 55-1 at 3 ¶ 4 ["Plaintiff did not disclose to [Defendants] the identity of Mr. McCaffrey or the anticipated nature of his testimony prior to March 6, 2023."].) Because this disclosure occurred well after the expiration of the relevant deadlines in the scheduling order, it was untimely.

The real dispute is whether Plaintiff can meet its resulting burden of showing that the disclosure violation was "substantially justified or harmless." The Court construes Plaintiff's response brief as focusing only on substantial justification—specifically, that Defendants' late disclosure of Simon was sanctionable and justified Plaintiff's even later retention and disclosure of McCaffrey, which was necessary to enable Plaintiff to rebut Simon's late-disclosed opinions and factual assertions.

Plaintiff's substantial-justification argument fails for two independent reasons. First, Plaintiff has not identified any authority suggesting that a permissible self-help remedy for the untimely disclosure of a witness by an opposing party is an even more untimely disclosure of another witness by the aggrieved party. To the extent Plaintiff believes Defendants violated their disclosure obligations under Rule 26(a) in relation to Simon, Plaintiff's remedy was to seek the exclusion of Simon under Rule 37(c) (which Plaintiff has not done). Plaintiff was not, in contrast, entitled to unilaterally (and without leave of Court) retain and disclose a new witness months after the expiration of the relevant deadlines in the scheduling order.[1]

Second, Plaintiff's substantial-justification argument also fails for the alternative reason that the premise underlying Plaintiff's self-help theory—that Defendants committed a sanctionable disclosure violation in relation to Simon—is inaccurate. In their initial disclosure statement, which was provided to Plaintiff in July 2022 (well before the close of fact discovery), Defendants identified the following individual:

---

[1]     As noted, a party "facing sanctions" under Rule 37(c)(1) may attempt to identify "a sanction other than exclusion is better suited to the circumstances." *Merchant*, 993 F.3d at 741. But this is not what Plaintiff attempted to do here. In its motion papers, Plaintiff did not attempt to identify an alternative sanction (such as reopening discovery to allow McCaffrey to be deposed) that is less drastic than the sanction of exclusion. Rather, Plaintiff effectively argued that no sanction should be imposed because its conduct was substantially justified. During oral argument (and presumably in response to the forfeiture analysis as to this issue that appeared in the tentative ruling issued before oral argument), Plaintiff argued for the first time that reopening discovery to allow a McCaffrey deposition would be a permissible alternative sanction. Not only does this argument come too late, but the Court rejects it on the merits—reopening discovery at this juncture of the case would be disruptive and harmful to Defendants. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 862-63 (9th Cir. 2014) ("Orderly procedure requires timely disclosure so that trial efforts are enhanced and efficient, and the trial process is improved. The late disclosure of witnesses throws a wrench into the machinery of trial. A party might be able to scramble to make up for the delay, but last-minute discovery may disrupt other plans. And if the discovery cutoff has passed, the party cannot conduct discovery without a court order permitting extension. This in turn threatens whether a scheduled trial date is viable. And it impairs the ability of every trial court to manage its docket."); *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005) ("If Wong had been permitted to disregard the deadline for identifying expert witnesses, the rest of the schedule laid out by the court months in advance, and understood by the parties, would have to have been altered as well. Disruption to the schedule of the court and other parties in that manner is not harmless. Courts set such schedules to permit the court and the parties to deal with cases in a thorough and orderly manner, and they must be allowed to enforce them, unless there are good reasons not to.").

1

2

3

> A knowledgeable and qualified representative of Select Portfolio Servicing, Inc. has knowledge and information regarding the events and circumstances that are alleged in the Complaint, the history of the Property at issue in the Complaint, and SPS's business records, and is expected to testify regarding the same.

(Doc. 50 at 29.)   About two months later, in September 2022, Plaintiff propounded interrogatories and requests for admission to Defendants.  (Doc. 38.)  Among other things, Plaintiff sought more information about Defendants' theory as to how the $10,000 check was deposited and whether the deposit resulted in acceptance of the offer set forth in Plaintiff's March 2021 cover letter.  (Doc. 55-1 at 22-23.)  In a response provided in November 2022 (still before the close of fact discovery), Defendants explained, in relevant part, that "[u]pon receipt of the March 21, 2022 [sic] Letter, SPS separated the $10,000.00 check from the letter and processed the check as a payment on the Loan pursuant to the terms of the Loan documents and SPS's routine practices and procedures.  This was done as matter of course, independent of SPS's review of and response to the contents March 22, 2021 Letter." (*Id.* at 28.)  Defendants also expressly offered to "produce a Rule 30(b)(6) witness that can testify as to how the check was processed." (*Id.* at 36.)  However, Plaintiff never asked Defendants to identify the name of the SPS representative who would be testifying about these topics and never sought to notice a Rule 30(b)(6) deposition of SPS. (*Id.* at 5-6 ¶¶ 13, 18.)

It is against this backdrop that Defendants produced Simon's declaration on February 3, 2023, as an attachment to their summary judgment motion.  (Doc. 49-1 at 2-12.)[2]  In the declaration, Simon explains that she is "familiar with SPS's loan boarding process, which is the process by which loans are screened before being serviced by SPS" and "SPS's policies and procedures discussed herein, including but not limited to the handling of incoming inquiries, mail, and payments by SPS's various departments." (*Id.* at 3 ¶¶ 4-5.)  Simon's declaration goes on to describe SPS's policies and procedures for

---

[2]      Although the declaration itself does not identify Simon's position at SPS, Defendants previously produced interrogatory responses that Simon signed on behalf of SPS in her capacity as "the Document Control Officer of Defendant, Select Portfolio Servicing, Inc. ('SPS')." (Doc. 55-1 at 39.)

handling incoming payments and specifically explains, in relation to the disputed issues in this case, that the check Plaintiff sent to SPS in March 2021 was separated from its attached letter as a routine matter of processing and the $10,000 was applied to the loan balance rather than as acceptance of any agreement.  (*Id.* at 8-9 ¶¶ 23-30.)  Simon also authenticates nearly 150 pages of attachments.[3]  (*See, e.g.*, *id.* at 4 ¶¶ 7-9 [authenticating the note and DOT]; *id.* at 5-7 ¶¶ 16-27 [authenticating the transfer to SPS and SPS transaction history].)

Defendants' disclosure efforts in relation to Simon were sufficient under Rule 26(a)(1)(A)(i).  As noted, that rule requires the disclosure of both "the name . . . of each individual likely to have discoverable information" and "the subjects of that information."  As for the former requirement, although Defendants did not identify Simon by name in their July 2022 disclosure—instead, she was generically identified as "[a] knowledgeable and qualified representative of Select Portfolio Servicing" (Doc. 50 at 29)—many courts and commentators have concluded that when, as here, a party seeks to disclose a corporate representative who will testify about corporate policies, it is not necessary to identify that individual by name.  1 Gensler, Federal Rules of Civil Procedure, Rule 26, at 793 (2022) ("The term 'individuals' [in Rule 26(a)(1)(A)] does not include corporate entities or individuals who later testify for the entity under Rule 30(b)(6)."); *Moore v. Computer Assocs. Int'l, Inc.*, 653 F. Supp. 2d 955, 959 (D. Ariz. 2009) (denying plaintiff's motion to strike an affidavit from a corporate representative that was submitted for the first time at summary judgment, where the plaintiff argued that the affidavit was improper because the defendant never identified the corporate representative by name in its Rule 26 disclosures, because Rule 26's disclosure requirement is "limited to individuals and exclusive of corporate entities, an exclusion which would necessarily apply to individuals who testify on behalf of corporate entities").  The Court finds those cases and authorities persuasive, while acknowledging that the Ninth Circuit does not appear to have spoken definitively on the issue and that some courts have reached contrary conclusions.  *See generally Hooks v.*

---

[3]  Simon also explains that the "total amount due and owing on the Loan in April 2021 was $263,737.84."  (Doc. 49-1 at 12 ¶ 49.)

1   *GEICO Gen. Ins. Co., Inc.*, 2016 WL 5415134, *8 (M.D. Fla. 2016) ("[T]he Court

2   acknowledges that there is authority on both sides of this issue.") (collecting cases).

3            Similarly, as for Rule 26(a)(1)(A)(i)'s other requirement (*i.e.*, disclosure of "the

4   subjects" of the information possessed by the individual), the Court again concludes that

5   although the governing law is not entirely settled,[4] Defendants' disclosure effort was

6   sufficient.  Defendants disclosed that SPS's corporate representative had "information

7   regarding the events and circumstances that are alleged in the Complaint, the history of the

8   Property at issue in the Complaint, and SPS's business records." (Doc. 50 at 29.)  Although

9   these descriptions are admittedly pitched at a high level of generality and don't identify

10  what SPS's corporate representative would actually be saying about SPS's check-deposit

11  process, such a level of detail is at least arguably not required by Rule 26(a)(1)(A)(i), which

12  only calls for a description of "the subjects of that information" about which the witness

13  has knowledge.  Notably, other portions of Rule 26(a) call not only for the disclosure of

14  the "subjects" that a particular witness will address, but also for the disclosure of the

15  specific opinions the witness holds in relation to those subjects.  *See* Fed. R. Civ. P.

16  26(a)(2)(B)(i) (for experts who must provide a written report, requiring disclosure of "a

17  complete statement of all opinions the witness will express and the basis and reasons for

18  them"); Fed. R. Civ. P. 26(a)(2)(C)(i)-(ii) (for experts who need not provide a written

19  report, requiring disclosure not only of "the subject matter on which the witness is expected

20  to present evidence" but also "a summary of the facts and opinions to which the witness is

21  expected to testify").  This suggests, by implication, that Rule 26(a)(1)(A)(i) requires

22  something less (and that Defendants' disclosure efforts here satisfied that lesser standard).

23           Alternatively, even if that SPS's disclosures in relation to Simon were deficient

24  under Rule 26 (either as to the identity of the corporate representative or to the subjects of

25  the information possessed by that witness), any deficiency was substantially justified and

26

27  ---

    [4]      *See generally Lipari v. U.S. Bancorp, N.A.*, 2008 WL 2874373, *2 (D. Kan. 2008)
    ("This Court has found only a handful of cases that address the degree of specificity
28  required under Rule 26(a)(1)(A)(i) regarding the subject of the discoverable information
    known by the potential witness.").

harmless.  Substantial justification is present because, for the reasons discussed, there is at least some authority suggesting that Defendants' approach was sufficient.  As for harmlessness, SPS made crystal clear to Plaintiff, through other timely disclosures as part of the discovery process, that its position was that the check had been separated from the letter before the deposit and cashed pursuant to SPS's standard process for handling incoming payments.  SPS also went out of its way to offer up a corporate representative to sit for a Rule 30(b)(6) deposition on this topic (an offer that Plaintiff ignored) and disclosed, albeit in a roundabout way, that Simon was a knowledgeable representative who could testify about SPS's records and check-handling process.  Given this backdrop, Plaintiff cannot credibly claim that it was surprised by the contents of Simon's declaration, which simply repeats the statements SPS previously made about its check-cashing process.  *Cf. Liberty Ins. Corp.*, 41 F.4th at 1190 ("[T]he purported defect—that the Brodeurs disclosed Jerry could testify only about the claims in the 'underlying lawsuit' as opposed to disclosing that he could testify about the claims in the 'current lawsuit'—was harmless because Liberty filed this action for the sole purpose of determining its coverage obligations to the Brodeurs and Jerry Brodeur was the only witness who testified about facts relevant to his Liberty insurance policy."); *Garrett v. Trans Union, L.L.C.*, 2006 WL 2850499, *7 (S.D. Ohio 2006) ("Citifinancial argues, and this Court agrees, that Plaintiff's motion is meritless and should be denied because . . . even if there was a discovery violation, the violation is harmless because Plaintiff always knew that a representative of Citifinancial would testify.").

Plaintiff's brief also seems to suggest that Defendants' disclosure efforts in relation to Simon were deficient because she was only disclosed as a fact witness and her declaration "goes beyond summarization and leaks into opinion." (Doc. 50 at 19.)  Any such argument lacks merit.  Plaintiff does not identify any specific portions of Simon's declaration that purportedly qualify as opinions—instead, Plaintiff criticizes Simon's declaration in its entirety, as well as all 13 attached exhibits.  (*Cf.* Doc. 55 at 4 ["Yet, Plaintiff does not point to a *single statement* in Ms. Simon's Declaration that is opinion

rather than fact."].)  Additionally, as discussed in later portions of this order, the relevant portions of the Simon declaration that the Court has considered when resolving the parties' summary judgment arguments deal with facts, not opinions.

Plaintiff also seems to challenge the foundation for Simon's personal knowledge. (Doc. 50 at 19 ["How does she know?  Her testimony is not authenticated by documents or even as hearsay from identifiable employees."].)  But that argument is undermined by Simon's inclusion of over 100 pages of supporting exhibits (Doc. 49-1 at 14-157), as well as her avowal that she is "familiar with SPS's loan boarding process, which is the process by which loans are screened before being serviced by SPS" and "SPS's policies and procedures discussed herein, including but not limited to the handling of incoming inquiries, mail, and payments by SPS's various departments" (*id.* at 3 ¶¶ 4-5).  *Cf.* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony.").

In sum, Plaintiff violated Rule 26(a) by disclosing McCaffrey after the relevant disclosure deadlines had expired; Defendants did not violate Rule 26(a) with respect to Simon (and even if they had, any violation was substantially justified and harmless); Plaintiff's late disclosure of McCaffrey was not substantially justified or harmless; McCaffrey's declaration will be excluded under Rule 37(c)(1) as a sanction for the disclosure violation; and Simon's declaration (even though Plaintiff has not formally sought to exclude it as a discovery sanction) is properly before the Court for summary judgment purposes.

### C.    **Factual Assertions In Defendants' Response To Plaintiff's Motion**

In their response to Plaintiff's motion for summary judgment, Defendants "incorporate, as though set forth fully herein, Part II ('RELEVANT FACTUAL BACKGROUND') of Defendants' Motion for Summary Judgment [Dkt. 47] and all exhibits thereto."  (Doc. 52 at 3.)  In its reply, Plaintiff objects to this approach because it "is forced to speculate on which facts it is obligated to address by the Reply Brief."  (Doc.

56 at 4.)

Plaintiff's objection is unavailing.  "[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits.  In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (cleaned up).  Therefore, to the extent Plaintiff is concerned that there is insufficient space in the reply to contest Defendants' factual assertions, the Court will look to Plaintiff's response to Defendants' motion for summary judgment (Doc. 50) and incorporate those objections by reference.  Plaintiff seeks no additional relief.

D.     **Plaintiff's Counsel's Statement To Defense Counsel**

In response to Plaintiff's motion, Defendants included a declaration from their counsel, who avows that, during a call on October 19, 2021, Plaintiff's counsel said something to the effect of "SPS probably did not understand the nature of the tender from Plaintiff and mistakenly assumed that he represents the borrower, Mr. Schmid."  (Doc. 52 at 3; Doc. 52-1 at 2-3 ¶¶ 3-4.)  In its reply, Plaintiff objects on what appear to be four grounds: (1) the conversation involved "settlement discussions" and is thus inadmissible under Rule 408; (2) the challenged statement is "hearsay"; (3) Plaintiff's counsel "had no personal knowledge" as to SPS's knowledge, and thus lacked foundation to make statements on that topic; and (4) "any words spoken, as hypothetical for settlement purposes, have no probative value."  (Doc. 56 at 4.)  Plaintiff's counsel also submitted a declaration explaining he "engaged in settlement discussions under the hypothetical that [Defense counsel] is right and there was a mistake in the interest of case resolution."  (Doc. 56 at 20.)

The Court agrees with Plaintiff that the challenged statement is objectionable and not properly before the Court at summary judgment.  As an initial matter, Plaintiff has submitted evidence that the challenged statement occurred in the context of settlement negotiations between the parties and Defendants have not submitted any controverting

evidence as to that issue.  Perhaps the Court is missing something, but this seems like a rather obvious situation where Rule 408 would apply.  *See* Fed. R. Evid. 408(a)(2) (identifying "a statement made during compromise negotiations about the claim" as one of the categories of evidence that "is not admissible—on behalf of either party—either to prove or disprove the validity . . . of a disputed claim").  Additionally, the challenged statement represents, at most, Plaintiff's counsel's equivocal speculation about SPS's intent and mindset.  Defendants make no effort to explain why such a statement would be relevant and admissible, let alone dispositive, at summary judgment.

II.    Relevant Facts

Having resolved the parties' various evidentiary objections (and excluded certain factual assertions in Plaintiff's motion, McCaffrey's declaration, and Plaintiff's counsel's statement), the Court now proceeds to compile a summary of the relevant facts, which is taken from the parties' summary judgment submissions and other documents in the record. The facts are uncontroverted unless otherwise noted.

In 2006, non-party Brian Schmid ("Schmid") bought a home in Maricopa, Arizona, which is located in Pinal County (the "Property").  (Doc. 47-1.)  Schmid also executed a note that was secured by a first-position DOT.  (Doc. 47-2.)  The note was for $160,000. (*Id.* at 1.)  The DOT was recorded in November 2006 in the Pinal County Recorder's Office.  (Doc. 47-4.)  The current beneficiary of the DOT, following an assignment, is Deutsche Bank.  (Doc. 11 at 37.)

In or around August 2012, Schmid abandoned the Property and stopped making mortgage and HOA fee payments.  (Doc. 49-1 at 4 ¶ 11.)  Neither Defendants nor their predecessor initiated foreclosure proceedings at that time.  (*Id.* at 4 ¶ 14.)[5]

On November 7, 2017, the HOA filed a lawsuit against Schmid in Pinal County

---

[5]    The reason for this is disputed.  Plaintiff contends that Defendants were plainly delinquent in enforcing their rights.  (*See, e.g.*, Doc. 47 at 8 [asserting Defendants are barred from collecting on the debt because of the statute of limitations].)  Defendants contend that "Schmid was serving in active duty on the United States Army and [was] thus subject to the protections of the Servicemembers Civil Relief Act."  (Doc. 49-1 at 4 ¶ 14; *id.* at 18 [Schmid service record].)

Superior Court for unpaid assessments, fines, fees, and other monies owed to the HOA. *Acacia Crossings Homeowners Assn. v. Schmid*, No. CV-2017-01-1999 (Pinal Cnty. Super. Ct. Nov. 7, 2017).[6]

On June 8, 2020, the HOA obtained a default judgment against Schmid.  (Doc. 48 at 24.)

On September 23, 2020, the court in the HOA lawsuit ordered that the Property be sold by sheriff's sale pursuant to the default judgment.  (Doc. 48 at 24.  *See also Acacia Crossings Homeowners Assn. v. Schmid*, No. CV-2017-01-1999 (Pinal Cnty. Super. Ct. June 8, 2020).)

On December 31, 2020, the Property was sold at a public auction conducted by the Pinal County Sheriff.  (Doc. 11 at 44-45, 48.)  Plaintiff purchased the Property for $16,655.54.  (*Id.*)

After the sale, Steve Villarreal, Plaintiff's manager, contacted Schmid for additional information related to "the DOT and underlying loan" and learned that SPS "is acting as the loan servicer for the underlying loan secured by the DOT."  (Doc. 48 at 24.)

On March 22, 2021, Plaintiff sent a letter to SPS.  (Doc. 11 at 55-56.)  The caption of this letter included the phrases "NOTICE: DEBT BARRED BY STATUTE OF LIMITATIONS," "DEMAND: RELEASE DEED OF TRUST," and "ACCORD AND SATISFACTION."  (*Id.* at 55.)  The letter was sent to SPS at P.O. Box 65277, Salt Lake City, UT 84165[7] and by email to "crdocs@sls.net."  (*Id.*)  In the body of the letter, Plaintiff wrote the following:

> Please be advised this firm has been retained to represent the interests of Equity Recovery Specialists, LLC ("ERS") with respect to its ownership interest in real property located at 44916 W. Gavilan Dr., Maricopa, AZ 85239 ("Property") and your attempt to collect a debt arising from the above referenced loan number that is secured by a first position deed of trust recorded in the Pinal County Recorder's on October 3, 2006, at document

---

[6]   The Court takes judicial notice of the complaint and judgment.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court may take judicial notice of matters of public record . . . .").

[7]   Defendants argue and present evidence that this address is "publicly published by SPS as the address to send a 'Notice of Error or Information Request or Qualified Written Request.'"  (Doc. 47 at 6; Doc. 49-1 at 147.)

number 2006-139462 ("Loan").   No one, including your attorneys, employees, agents, successors or assigns is authorized to contact my client directly.  All communications must come through this office.

The Property used to be owned by Bryan Schmid ("Mr. Schmid") and is subject to the Acacia Crossing Homeowners Association ("HOA").   Mr. Schmid has not paid on this loan since August 2012 and has not paid the HOA since about then.  Mr. Schmid moved out of the Property at about that time and abandoned any interest.  No one has lived in the Property since 2012.  According to Mr. Schmid, the previous loan servicer was aware that he abandoned the property, thus triggering the lender's duty to mitigate, which may only be accomplished through debt acceleration and a non-judicial foreclosure or a lawsuit against Mr. Schmid on the debt.  Stated another way, a loan servicer cannot sit back and accrue default interest while letting the collateral sit vacant for nearly ten years.  If there was not an actual debt acceleration, the duty to mitigate triggered a *de facto* acceleration.

The HOA finally filed suit against Mr. Schmid and obtained a judgment of foreclosure against him on or about June 8, 2020, for seriously delinquent HOA dues, fines and other charges.  A sheriff's sale did take place on or about December 31, 2020 and my client, ERS, was the winning bidder.  *See* Sheriff's Certificate of Sale on Foreclosure, enclosed herewith.

As stated above, there is no excuse for the Property to sit abandoned for nearly 10 years without any payment.  SPS and/or its predecessors in interest had a duty to mitigate and the debt was as good as accelerated.  Accordingly, any collection on the promissory note or enforcement of the DOT is barred by the six-year statute of limitations.  *See* A.R.S. § 33-816 & A.R.S. § 12-548; *see also, Andra R. Miller Designs, LLC v. U.S. Bank, N.A.*, 418 P.3d 1038, 1040 (Ariz. App. 2018).  Even assuming *arguendo* that the debt was not accelerated, collection efforts on any installment payments over six-years old are barred by the statute of limitations.  Based upon a recent payoff, SPS is attempting to collect the full balance.

Nonetheless, ERS would prefer to reach an amicable resolution as to all issues arising out of or relating to the Loan as opposed to litigating these contested issues.  Enclosed herewith is a check for $10,000 offered in accord and satisfaction for you to release the DOT.   See A.R.S. § 47-3311. *Depositing the enclosed check will be deemed an acceptance of this offer.* ERS takes no position with respect to any issues by and between Mr. Schmid and SPS.

Should you reject this offer, please consider this letter as ERS formal debt dispute pursuant to the FDCPA and request for debt verification.   Please include the Loan's full payment history as well as any/all communications sent by SPS (or its predecessor(s) in interest) since January 1, 2009, for debt acceleration evaluation purposes.

I look forward to your prompt compliance with the above requests. Please do not hesitate to contact me should you have any questions or wish to discuss.

(Doc. 11 at 55-56.)  Enclosed with the letter was a check made out to SPS in the amount

of $10,000, the Sheriff's Certificate Upon Sale, and a document tiled "Authorization for

Release of Information." (*Id.* at 56, 58.)  In relevant part, the "Authorization for Release of Information" explains:

> By signing below, I/we hereby authorize and instruct The Law Office of Kyle A. Kinney, PLLC to contact lienholders, both in writing and by phone.  I further authorize the release of information to The Law Office of Kyle A. Kinney, PLLC.  I understand statement and/or fax fees may be incurred and authorize and agree to pay for said charges.

(Doc. 49-1 at 134.)  The "For" line of the check says, "For accord & satisfaction 44916 W. Gavilan Dr. Maricopa 85239 Loan: 0023278708."  (Doc. 11 at 58.)

On March 31, 2021, SPS mailed a letter to Schmid informing him that "SPS recently received a check sent to a non-payment address for SPS.  This payment has been processed and credited to the account.  In order to ensure all future payments are applied as efficiently as possible, please sent all future payments to the payment address below."  (Doc. 49-1 at 149.)

On April 5, 2021, SPS mailed a letter to Plaintiff's counsel.  (Doc. 49-1 at 151.)  In relevant part, the letter explains: "SPS received your recent inquiry(ies) on 03/31/2021. We will review your request(s) and route to the appropriate department for handling.  If a response is required, one will be provided to you within 30 days from the date we received your inquiry(ies)."  (*Id.*)  The letter indicated that the "Customer Name" was "Bryan Schmid."  (*Id.*)

That same day, SPS sent a separate letter to Plaintiff's counsel informing him that "Deutsche Bank National Trust Company" is the trustee and owner of the property and that "SPS is the mortgage servicer of the account."  (Doc. 49-1 at 153.)  No customer name was listed, only an account number and property address.  (*Id.*)

On April 12, 2021, SPS endorsed and deposited the $10,000 check.  (Doc. 11 at 60; Doc. 31 at 6 ¶ 48 ["Defendants admit only that SPS endorsed and deposited the check.  SPS denies that it did so on April 14, 2021."].)  As discussed in later portions of this order, the parties dispute the legal significance of this act.  Citing the terms of the March 2021 letter, Plaintiff asserts that SPS cashed the check as an acceptance of Plaintiff's DOT-release offer.  (Doc. 48 at 14 ["SPS deposited the check for consideration as authorized by the

terms of the March 22, 2021, cover letter , , , without rejection of the terms or counter-offer."].)  Defendants contend, in reliance on Simon's declaration, that the check was cashed pursuant to "SPS's routine practices and procedures." (Doc. 49-1 at 8 ¶ 30.)  More specifically, Simon explains that after "the Mail Center separated the $10,000 Check from the March 22, 2021 Letter and imaged the check together with the envelope that contained it," "the QWR Department immediately re-routed it to Cashiering," which, in turn, "entered a note into SPS's account history for the Loan that the customer had sent payment to an incorrect payment address" and then "processed the check . . . as a payment on the Loan pursuant to the terms of the Loan documents and SPS's routine practices and procedures." (*Id.* 7-8 ¶¶ 26-28.)  In other words, Defendants contend that, instead of depositing the check as an acceptance of the offer to release the DOT, "SPS applied the proceeds to the Loan account."  (*Id.*  at 8 ¶ 31.)

On April 30, 2021, SPS sent another letter to Plaintiff's counsel.  (Doc. 49-1 at 155.)  This letter was addressed to "BRYAN SCHMID."  (*Id.*)  In relevant part, SPS explained "you requested all communication be to your office" but informed Plaintiff that "Mr. Schmid is enrolled in paperless statements."  (*Id.*)  Under the heading "Allegations," the letter stated that SPS "reviewed your claims and find no merit to your allegations.  SPS is confident that the servicing of the loan by SPS has been compliant with all applicable state and federal regulations."  (*Id.* at 156.)  Under the heading "Validation of Debt," the letter stated that SPS "service[s] the account according to the terms of the InterestFirst Note and Deed of Trust."  (*Id.*) Finally, the letter concluded that "[a]s of this letter, the account is due for June 1, 2013."  (*Id.*)  Two documents were attached to the letter: the "InterestFirst Note and Deed of Trust" and the "SPS Transaction History and the SunTrust Mortgage Customer Account Activity Statement."  (*Id.*)

On July 22, 2021, Plaintiff (through Plaintiff's counsel) sent another letter to SPS, both via paper mail and email.  (Doc. 11 at 62-63.)  The caption of this letter included the phrases "NOTICE: DEBT SETTLED VIA ACCORD AND SATISFICTION" and "DEMAND: RELEASE DEED OF TRUST."  (*Id.* at 62, emphasis omitted.)  In the body

of the letter, Plaintiff wrote in relevant part as follows:

> Please be advised that this firm sent Select Portfolio Servicing, Inc. ("SPS") a letter dated March 22, 2021, together with a check for $10,000, as accord and satisfaction of the full amount of the seriously stale debt regarding the above referenced loan number (the "Letter"). This firm represents Equity Recovery Specialists, LLC ("ERS") who is an investor that purchased the subject property at a homeowner's association sheriff's foreclosure sale and is now the title holder of the subject property; this firm does <u>not</u> represent the borrower on the above referenced loan account.

> The [March 2021] Letter could not have been clearer: the Letter tendered an instrument as full satisfaction of the debt pursuant to pursuant to A.R.S. § 47-3311. A copy is enclosed for your ease of reference. SPS deposited the check on <u>April 12, 2021</u>. A.R.S. § 47-3311(c)(2) provided SPS with a 90-day grace period to change its mind and refund the $10,000 to ERS. That period expired on July 12, 2021. No tender was received. As of the date of this letter, ERS has not been given a release of deed of trust nor has one been recorded with the Maricopa County Recorder's Office.

> **PLEASE BE ADVISED THAT** your deposit of ERS' check constituted an acceptance of full satisfaction of the debt pursuant to A.R.S. § 47-3311;

> **PLEASE BE FURTHER ADVISED THAT** pursuant to A.R.S. § 47-3311(C)(2), SPS failed to tender the $10,000 back to ERS thus the deed of trust must be released.

> **PLEASE BE FURTHER ADVISED THAT SPS** is now obligated to record a release of the deed of trust recorded in the Pinal County Recorder's on October 3, 2006, at document number 2006-139462 pertaining to the above referenced loan (the "DOT").

> **IT IS HEREBY DEMANDED THAT** you release the DOT no later than August 25, 2021 or this office will file a lawsuit against you to enforce the accord and satisfaction agreement (i.e., requiring you to release the DOT) and will seek all of ERS' costs and attorney fees incurred therein.

(*Id.* at 62-63.) SPS did not respond to this letter. (*See generally* Doc. 47.) To date, SPS has not returned the $10,000. (Doc. 31 ¶ 52 ["Defendants admit that SPS did not record a lien release, provide a release to Plaintiff's counsel, or return the $10,000.00 paid to SPS via the Check prior to the date of the filing of the FAC."].)

On November 17, 2021, Plaintiff "conveyed title by Warranty Deed" to a non-party buyer for $322,000. (Doc. 11 at 51-53.; Doc. 48 at 24.) "In order to facilitate the sale [Plaintiff] gave a guarantee that the lien would be released." (Doc. 48 at 24.)

III.   Procedural History

On September 27, 2021, Plaintiff initiated this action by filing a complaint in Pinal

County Superior Court.  (Doc. 1-3 at 5-12.)  Defendants later timely removed the action to this Court.  (Doc. 1.)

On December 6, 2021, Plaintiff filed the operative FAC.  (Doc. 11.)

On December 28, 2021, Defendants filed a motion to dismiss.  (Doc 15.)

On January 11, 2022, Plaintiff filed a response.  (Doc. 17.)

On January 25, 2022, the parties filed a stipulation of dismissal as to Counts Three and Five of the FAC.  (Doc. 21.)

That same day, Defendants filed a reply in support of the motion to dismiss.  (Doc. 23.)

On May 6, 2022, the Court granted Defendants' motion to dismiss in part and denied it in part.  (Doc. 28.)  The Court granted the parties' stipulated dismissal of Count Three (accord and satisfaction) and Count Five (equitable indemnification).  (*Id.* at 11-12.)  The Court denied the motion to dismiss as to Count One (breach of express contract) and Count Two (breach of implied contract).  (*Id.* at 8-11.)  Plaintiff did not dispute the dismissal of Count Four (quasi contract-estoppel).  (*Id.* at 14-15.).  The Court authorized Plaintiff to file a second amended complaint to cure the defects in Count Four (*id.* at 15-16), but Plaintiff subsequently declined to do so.

On February 3, 2023, the parties filed cross-motions for summary judgment.  (Docs. 47, 48.)  Those motions are now fully briefed.  (Docs. 49-50, 52, 55-56.)

On August 1, 2023, the Court issued a tentative order.  (Doc. 58.)

On August 15, 2023, the Court held oral argument.  (Doc. 59.)

## LEGAL STANDARD

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Railway Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

As noted, "when parties submit cross-motions for summary judgment, [e]ach

motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cty.,* 249 F.3d at 1136 (quotation marks omitted). For "the party with the burden of persuasion at trial"—usually the plaintiff—to succeed in obtaining summary judgment in its favor, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). The party without the burden of persuasion at trial—usually the defendant—is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex Corp.*, 477 U.S. at 322-23. This distinction reflects that the burden is ultimately on the proponent of each claim to prove it. *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

## DISCUSSION

The only relevant difference between Counts One and Two is that Count One characterizes SPS's act of cashing the check as "express[]" acceptance of the offer set forth in the March 2021 letter while Count Two characterizes it as "implied[]" acceptance. Thus, with respect to both motions, the Court addresses Counts One and Two together.

I.    Defendants' Motion For Summary Judgment

A.    **Accord And Satisfaction**

1.    The Parties' Arguments

Defendants argue they are entitled to summary judgment on Plaintiff's breach of contract claims for three reasons. (Doc. 47 at 2.) Because the first two reasons are distinct from the third, the Court will group them accordingly. Defendants' first two arguments

are that (1) "to the extent that Plaintiff's contract claims derive from an attempted accord and satisfaction" pursuant to A.R.S. § 47-3311, Plaintiff cannot satisfy the required statutory elements; and (2) to the extent Plaintiff is *not* attempting to assert such a statutory claim, and instead "improperly tried to plead around the required statutory elements for accord and satisfaction by couching the same claim as two separate breach of contract claims," those claims are preempted by A.R.S. § 47-3311.  (*Id.*)

In response, Plaintiff argues that Defendants' first argument fails because "[Plaintiff] has standing as it owned the secured Property on March 22, 2021 when the offer was made.  The DOT, as the enforcement tool, embodies a claim for money conferring standing to Plaintiff as the party against whom a claim is made.  [Plaintiff's] offer clearly stated it was not made to resolve Schmid's debt.  Defendants lack standing to raise A.R.S § 47-3311 as a defense as they are not protected as the debtor under the statute. . . . The value of the lien is not liquid and subject to dispute."  (Doc. 50 at 5-6.)  As for Defendants' second argument, Plaintiff responds that "[n]o cases are offered holding A.R.S. § 47-3311 as preemptive" and, at any rate, "Defendants[] waived preemption and all other defenses to the offer when they accepted [Plaintiff's] performance."  (*Id.* at 6.)

In reply, Defendants argue that "Plaintiff fails to show that it has standing under A.R.S. § 47-3311 or could otherwise meet the elements of the statute" and "fails to show that its offer of an accord and satisfaction was legally valid."  (Doc. 55 at 1.)

## 2.   Analysis

Defendants' first argument, which addresses whether Plaintiff could have prevailed on a statutory accord-and-satisfaction claim under A.R.S. § 47-3311, does not provide a basis for granting summary judgment in Defendants' favor.  Although Plaintiff asserted such a claim at the outset of the case, Plaintiff later agreed that this claim could be dismissed.  (Doc. 28 at 12 ["Per the parties' stipulation, Count Three is dismissed with prejudice."].)  Plaintiff has also clarified that its remaining breach-of-contract claims are not accord-and-satisfaction claims under § 47-3311.  It is therefore unnecessary—at least for purposes of Defendants' first argument—to analyze the hypothetical validity of

1    Plaintiff's since-dismissed claim (or to address Plaintiff's argument that Defendants would

2    lack standing to oppose such a hypothetical claim).

3        As for Defendants' second argument, which is that § 47-3311 preempts Plaintiff's

4    breach of contract claims, the Court concluded in the tentative ruling issued before oral

5    argument that Defendants were not entitled to relief, even though their preemption theory

6    presented a "closer call," in light of the Arizona courts' exacting standards for finding

7    preemption[8] and Defendants' failure, in their motion papers, "to explore the legislative

8    history of § 47-3311 or identify any express evidence of preemptive intent."  (Doc. 58 at

9    25-28.)

10       During oral argument, in an apparent attempt to address this omission, Defendants

11   cited an array of new cases and statutory provisions that they did not cite in their motion

12   papers.  On the one hand, this approach is improper and frustrating.  Preemption challenges

13   are complicated and ordinarily require much more development than the cursory treatment

14   Defendants provided in their motion papers.  Additionally, by citing their best authorities

15   for the first time during oral argument, Defendants deprived Plaintiff (and the Court) of the

16   opportunity to meaningfully respond to those authorities.  On the other hand, the question

17   of preemption is ultimately a question of law that Defendants did raise (however cursorily)

18   in their motion papers, and counsel's description of the newly cited authorities during oral

19   argument suggests that the preemption analysis in the tentative ruling may require further

20   development.

21       Under the circumstances, the Court concludes that the best, most efficient solution

22   is to deny Defendants' current preemption-based request for summary judgment without

23

24   _____

[8]     *Hayes v. Continental Ins. Co.*, 872 P.2d 668, 676-77 (Ariz. 1999) (noting that "even
25   in situations in which the legislature can constitutionally abrogate, preempt, or deny
     common-law rights, given the importance of those concepts in Arizona history and
26   jurisprudence, we are reluctant to interpret a statute in favor of denial or preemption . . . if
     there is any reasonable doubt about the legislature's intent" and that courts "will not find
27   divestiture unless stated clearly, explicitly, and unambiguously" and should "generally
     decline[] to find preemption of a cause of action in the absence of a very clear statement of
28   legislative intent or, better yet, a clear statement in the statute's text").  *See also Zambrano
     v. M & RC II, LLC*, 517 P.3d 1168, 1173 (Ariz. 2022) ("The freedom to contract has long
     been considered a 'paramount public policy' under our common law that courts do not
     lightly infringe.") (citation omitted).

1    prejudice and authorize Defendants to file a successive summary judgment motion limited

2    to that issue.  This will ensure that Plaintiff has a full and fair opportunity to address

3    Defendants' argument and cited authorities.  *Hoffman v. Tonnemacher*, 593 F.3d 908, 911

4    (9th Cir. 2010) (holding that "district courts have discretion to entertain successive motions

5    for summary judgment" and noting that "allowing a party to file a second motion for

6    summary judgment" can be "logical" and "foster[ ] the 'just, speedy, and inexpensive'

7    resolution of suits") (quoting Fed. R. Civ. P. 1).

8         B.    **Mutual Assent**

9              1.    The Parties' Arguments

10   Defendants' final summary judgment argument is that "even if Plaintiff's breach of

11   contract claims were not preempted, the indisputable facts demonstrate there was no

12   manifestation of mutual assent between Plaintiff and Defendants.  SPS treated the letter as

13   a dispute and request for debt verification from the borrower, thereby implicitly rejecting

14   Plaintiff's offer of accord and satisfaction.  SPS only deposited the $10,000 check as a

15   matter of course without consideration of the purported offer.  Indeed, SPS was unaware

16   of the nature of Plaintiff's proposal prior to depositing the check and, more importantly,

17   Plaintiff was on notice of that fact such that it could not have reasonably believed its

18   purported offer was accepted.  Accordingly, there was no objective manifestation of mutual

19   assent, or actual meeting of the mind."  (Doc. 47 at 2.)  In support of this position,

20   Defendants emphasize that "Plaintiff sent the purported offer to an improper address" and

21   that, based on this improper address, "the Mail Center that processed it separated the

22   $10,000 Check from the letter pursuant to SPS procedures, resulting in both the letter and

23   the check being routed separately within SPS."  (*Id.* at 13-14.)  Defendants contend that,

24   because the check and the letter were separated, "SPS understood the check to be a mere

25   loan payment" and processed it as such.  (*Id.* at 14.)  Defendants further contend that SPS's

26   April 30 letter "implicitly rejected any settlement of debt at that time and further put

27   Plaintiff on notice that SPS did not view its indorsement and cashing of the check as

28   creating any sort of agreement between [Plaintiff] and SPS."  (*Id.* at 15.)   Finally,

Defendants argue that "both the April 5, 2021 Acknowledgment Letter and the April 30, 2021 Letter put Plaintiff on notice that SPS did not even understand that [Plaintiff's counsel] represented a third party proposing an accord and satisfaction; rather, those letters put Plaintiff on notice that SPS misapprehended that [Plaintiff's counsel] represented Mr. Schmid." (*Id.*)

In response, Plaintiff contends: "A 'meeting of the minds' is not a requirement for the formation of an implied contract.  Defendants[] manifested assent by their acceptance of performance by [Plaintiff].  Defendants do not offer any authority in support [of] their notion of an 'implicit rejection.'"  (Doc. 50 at 6.)  Plaintiff further contends that "Defendants manifested assent either expressly; by the written endorsement on the back of the check, or implicitly; by cashing the check for consideration and failing to reject the offer within ninety days.  Defendants' failure to return the money for almost two years ratified their acceptance of the contract and [Plaintiff's] performance.  Defendants manifested assent to either an express contract, an implied contract, or both." (*Id.* at 8.) Plaintiff also contends that "Defendants imply a mistake was made by offering self-serving declaratory testimony from Michelle Simon, their corporate-legal spokesperson. Implication from conclusionary lay assumptions does not measure-up against hard factual evidence." (*Id.* at 10.)[9]  Finally, Plaintiff contends "[e]ven assuming, *arguendo*, the offer was deficient under A.R.S. § 47-3311, such that the rejection period is stretched beyond ninety-days, Defendants have failed to refund the consideration over these past twenty-three months.  Manifestation of assent is the only reasonable conclusion.  Defendants offer no alternative explanation for keeping the consideration." (*Id.*)

In reply, Defendants reiterate that "there was no manifestation of mutual assent necessary to form a contract, express or implied, because, although SPS deposited the $10,000 Check, Plaintiff admittedly did not contemplate that a binding contract would form

---

[9]     Plaintiff also asserts that Simon's testimony is deficient in various ways (Doc. 50 at 6) and that, based on McCaffrey's testimony, "Defendants are either lying or incapable of determining what happened to the $10,000.00 consideration" (*id.* at 12).  However, as discussed in earlier portions of this order, the Court does not consider McCaffrey's testimony for purposes of summary judgment and does consider Simon's.

under the terms of its offer until Plaintiff retained the proceeds of the Check for a period of 90 days, and during that time Plaintiff was put on notice that SPS did not even understand that an offer had been made."  (Doc. 55 at 11.)  Defendants also argue that, "[a]s to Plaintiff's contention that Defendants failed to return the funds, Plaintiff does not dispute that it never requested a return of the funds.  In addition, Plaintiff fails to address the fact that, under Arizona law, there is no manifestation of mutual assent if the party making an offer could not have reasonably believed, from an objective standpoint, that the other party's conduct manifested assent."  (*Id.*)[10]  According to Defendants, Plaintiff could not have "*reasonably* believed SPS's acceptance of the Check and failure to return the funds was a manifestation of mutual assent."  (*Id.*)

### 2.   Analysis

"[I]n an action based on breach of contract, the plaintiff has the burden of proving the existence of the contract, breach of the contract, and resulting damages."  *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004).  As for the first element, "[f]or an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms so that obligations involved can be ascertained."  *K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 677 P.2d 1317, 1320 (Ariz. Ct. App. 1983) (quoting Restatement (Second) of Contracts § 50).

"It is well-established that before a binding contract is formed, the parties must mutually assent to all material terms.  A distinct intent common to both parties must exist without doubt or difference, and until all understand alike there can be no assent.  If one party thinks he is buying one thing and the other party thinks he is selling another thing, no meeting of the minds occurred, and no contract is formed."  *Hill-Shafer P'ship v. Chilson Family Trust*, 799 P.2d 810, 814 (Ariz. 1990) (citations omitted).  Such mutual assent must be "based on objective evidence, not on the hidden intent of the parties."  *Id.* at 815.

---

[10]    To the extent Defendants challenge the substance of McCaffrey's testimony (*see, e.g.*, Doc. 55 at 5), those arguments need not be addressed given McCaffrey's exclusion.

One way of showing a lack of mutual assent is to show that the words of the purported agreement are "uncertain or ambiguous" or have a "dual meaning." *Id.* at 815-16 (citations omitted). Additionally, "extrinsic facts could create 'a latent ambiguity in otherwise clear and intelligible language.'" *Id.* at 815 (citing *Buckmaster v. Dent*, 707 P.2d 319, 321 (Ariz. Ct. App. 1985)). However, even in the absence of ambiguity or dual meaning, "[a]s long as the misunderstandings of the parties are reasonable under the specific circumstances of the case, a court may properly find a lack of mutual assent." *Id.* at 816. *See also id.* at 815 (noting that the court of appeals "held that [a party] cannot claim . . . that no meeting of the minds existed as to an essential term" when the contractual term itself "contained no ambiguity or ambivalence" before explaining that "[a]lthough the court of appeals' logic has a certain force to it, we cannot agree with it").

Applying these standards, Defendants have not demonstrated, at least for summary judgment purposes, that the purported contract is void due to a lack of mutual assent. As an initial matter, Defendants' attack on mutual assent differs from how such attacks are often made. As discussed, a party may seek to demonstrate a lack of mutual assent by showing that the words of the purported contact were "uncertain or ambiguous" or had a "dual meaning." *Hill-Shafer P'ship*, 799 P.2d at 814. Such claims usually arise when parties execute a written contract but there is a dispute about the wording or meaning of a particular clause. *See, e.g.*, *Buckmaster*, 707 P.2d 319 (ordering rescission of contract due to "a latent ambiguity as to the meaning intended by the parties for the phrase 'an easement for ingress and egress over the Entrance Street,'" which undermined "the required meeting of the minds"). But that is not the case here. The words used by Plaintiff when communicating the offer—"Enclosed herewith is a check for $10,000 offered in accord and satisfaction for you to release the DOT. *Depositing the enclosed check will be deemed an acceptance of this offer*" (Doc. 11 at 55-56)—were crystal clear.[11]

---

[11]     During oral argument, Defendants seemed to argue that the concepts of dual meaning and ambiguity are implicated here because the March 2021 letter constituted an offer to enter into one specific type of agreement—*i.e.*, an accord and satisfaction under § 47-3311—and thus they could not have understood that the act of cashing the check might qualify as assent to the different type of agreement that Plaintiff now contends was formed—*i.e.*, an express or implied contract that, as Plaintiff has now clarified, is not

Accordingly, Defendants' lack-of-mutual-assent theory here is best characterized as a claim that the parties attached materially different meanings to the *act* by which Defendants purportedly manifested their asset to Plaintiff's offer—*i.e.*, SPS's act of cashing the $10,000 check.  The starting point for analyzing this claim is § 19 of the Restatement (Second) of Contracts.[12]   Section 19, which is entitled "Conduct as Manifestation of Assent," provides:

> (1)   The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.
>
> (2)   The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.
>
> (3)   The conduct of a party may manifest assent even though he does not in fact assent.  In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause.

*Id.*

Given these principles, it is clear that SPS's act of cashing the $10,000 check potentially *could* qualify as assent to Plaintiff's offer, even if Defendants did not subjectively intend for it to do so.  As noted, § 19(1) clarifies that a manifestation of assent

---

[12] governed by § 47-3311.  Whatever the potential merit of this argument at trial, the Court declines to address it now because Defendants did not distinctly raise it as one of their grounds for seeking summary judgment.  *See* Fed. R. Civ. P. 56(f) (a district court may grant summary judgment "on grounds not raised by a party" only "[a]fter giving notice and a reasonable time to respond").  To the contrary, the arguments in Defendants' motion regarding mutual assent hinge on the premises that "SPS only deposited the $10,000 check as a matter of course without consideration of the purported offer" and that Defendants "did not even understand the basic nature of the March 22, 2021 Letter as conveying an offer on behalf of [Plaintiff]."  (Doc. 47 at 2, 16-17.)  Similarly, although Defendants asserted during oral argument that the contract claims in Counts One and Two fail due to a lack of consideration (because an offer to settle a debt for pennies on the dollar, where there is no bona fide dispute as to the legitimacy of the debt, is illusory), this is another example of an argument that was not properly raised in Defendants' motion papers.  Although Defendants argued in their motion that the $10,000 offer would be insufficient consideration for purposes of a statutory claim under § 47-3311 (Doc. 47 at 9-10), they did not argue that a non-statutory contract claim would fail for the same reason.

[12]   This section has been cited with approval by Arizona courts.  *See, e.g.*, *Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 132 P.3d 825, 828 (Ariz. 2006); *Carroll v. Lee*, 712 P.2d 923, 926 (Ariz. 1986).

may be made by "acts" and § 19(3) clarifies that "[t]he conduct of a party may manifest assent even though he does not in fact assent."  *See also* Restatement (Second) of Contracts § 19, cmt. a ("Conduct may often convey as clearly as words a promise or an assent to a proposed promise."); *id.*, cmt. d ("Actual mental assent is not essential to the formation of an informal contract enforceable as a bargain."); *Walker v. Rogers*, 182 S.W.3d 761, 768 (Mo. Ct. App. 2006) ("When Gene signed his name above the restrictive indorsement placed on the check by Ben, Gene indicated that he accepted the offer in a manner invited by the offeree, i.e., indorsement of the check."); *Rockwood Mfg. Corp. v. AMP, Inc.*, 806 F.2d 142, 144-45 (7th Cir. 1986) (noting that "courts have held that the act of cashing a check can function as an acceptance of an offer in certain circumstances" and collecting cases).[13]

As for whether SPS's act of cashing the check was, in fact, an effective manifestation of assent, § 19(2) provides that "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents."  *Id.*  It seems undisputed that the first part of this standard ("intends to engage in the conduct") is satisfied here.  Defendants do not argue that SPS accidentally deposited the check.

As for the second part of the § 19(2) standard, which is whether the party disputing the existence of mutual assent "knew or had reason to know that the other party may infer from his conduct that he assents," the undisputed evidence submitted by Defendants establishes that Defendants did not *actually* know that Plaintiff would infer, from SPS's act of cashing the $10,000 check, that Defendants had agreed to accept Plaintiff's offer.  The Simon declaration establishes that the letter was separated from the check upon delivery and that the proceeds were applied to the loan balance pursuant to SPS's routine check-handling process.  There is simply no evidence that anybody at SPS or Deutsche

---

[13]   In a related vein, although the general rule is that "an offeror does not have power to cause the silence of the offeree to operate as acceptance," this rule is subject to various exceptions.  Restatement (Second) of Contracts § 69, cmt. a.  One of those exceptions arises "where the offeree silently takes offered benefits."  *Id.*

Bank actually realized, during the check handling and processing sequence, that Plaintiff would perceive the act of cashing the check as a manifestation of asset to the settlement offer.

The true dispute, then, concerns whether Defendants "had reason to know" that Plaintiff would infer assent from the act of cashing the check. Comment b to § 19 explains that "[r]eason to know is to be distinguished from knowledge and from 'should know.' Knowledge means conscious belief in the truth of a fact; reason to know need not be conscious. 'Should know' imports a duty to others to ascertain facts; the words 'reason to know' are used both where the actor has a duty to another and where he would not be acting adequately in the protection of his own interests were he not acting with reference to the facts which he has reason to know." Comment c to § 19 further explains that "[i]n effect there must be either intentional or negligent creation of an appearance of assent."

On the one hand, Defendants have advanced a variety of reasons why a rational juror could conclude that they lacked any "reason to know" that Plaintiff would infer assent from the act of cashing the check. As noted in the Simon declaration, Plaintiff sent the letter and check to an address that wouldn't ordinarily be used by SPS to process the sort of settlement offer being presented here; SPS, following its ordinary procedures, separated the check from the letter, such that they were routed to different divisions within SPS that later processed them separately; SPS treated the check as a loan payment once it was processed; and SPS subsequently communicated to Plaintiff, in various ways, its mistaken belief that Plaintiff had tendered the $10,000 check as a loan payment. Indeed, even Plaintiff seems to acknowledge—in the course of objecting to the timing and foundation of the Simon declaration—that "[a] fair reading of her Declaration . . . implies that SPS cashed the check just as part of one big, excusable, misunderstanding." (Doc. 50 at 19.) Although Plaintiff apparently believes that the existence of a "big, excusable, misunderstanding" is irrelevant to the question of contract formation under Arizona law and § 19 of the Restatement, Plaintiff is wrong for the reasons described above. Additionally, although a lack of mutual assent must be "based on objective evidence, not

on the hidden intent of the parties," *Hill-Shafer P'ship,* 799 P.2d at 815, Defendants have come forward with such objective evidence here, in the form of the objective facts (wrong address, separating the check from the letter, applying the proceeds to the loan balance, etc.) described by Simon.  *See also Muchesko v. Muchesko*, 955 P.2d 21, 24 (Ariz. Ct. App. 1997) ("Courts may look at . . . the conduct of the parties[] and the surrounding circumstances in deciding whether a contract existed or whether a meeting of the minds occurred.").

On the other hand, in *Empire Machinery Co. v. Litton Bus. Tel. Sys.*, 566 P.2d 1045 (Ariz. Ct. App. 1977), the Arizona Court of Appeals addressed a similar question to the one presented here—whether the act of cashing a check and retaining the proceeds could be considered assent to a contract offer—and concluded that the trial court erred in resolving that question in either side's favor at summary judgment because "in our opinion the cashing of Empire's down payment check raises an issue of fact as to whether Litton assented to the contract."  *Id.* at 1050.  Similarly, in *Oppedahl & Larson v. Network Solutions, Inc.*, 3 F. Supp. 2d 1147 (D. Colo. 1998), where one of the disputed issues was whether cashing a check constituted acceptance of a contract offer, the district court conducted a comprehensive survey of cases that "both support the cashing or retention as acceptance rule and those that reject it" before concluding that "whether such an act constitutes an acceptance is a question of fact" that could not be resolved at summary judgment.  *Id.* at 1162-64.  These outcomes are consistent with the courts' usual approach of treating disputes over mutual assent as questions of fact to be resolved by the jury.  *See, e.g.*, *P.E. Sys., LLC v. CPI Corp.*, 289 P.3d 638, 643 (Wash. 2012) ("Contract formation requires an objective manifestation of mutual assent of both parties. . . .  Mutual assent to definite terms is normally a question of fact for the fact finder.") (citations omitted); *Brown v. Stored Value Cards, Inc.*, 2022 WL 17844168, *1 (9th Cir. 2022) (explaining that, under Oregon law, "[m]utual assent, historically referred to as the meeting of the minds, may be expressed in words or inferred from the actions of the parties" and that "[w]hether a particular statement or act (or failure to act) constitutes a manifestation of intent is a

question of fact") (cleaned up); *M.J. Daly & Sons, Inc. v. City of West Haven*, 783 A.2d 1138, 1142 (Conn. Ct. App. 2001) ("Without a mutual assent, or a meeting of the minds, there cannot be a valid accord.  Whether a meeting of the minds has occurred is a factual determination.") (citations and internal quotation marks omitted).

Given these precedents, the Court is concerned that it would be invading the province of the jury if it were to decide, as a matter of law, that there was no mutual assent. Assessing whether "the misunderstandings of the parties are reasonable under the specific circumstances of the case," as contemplated by *Hill-Shafer Partnership*, seems like a quintessential jury question here, where the reasonableness and reason-to-know inquiries will involve an evaluation both of Plaintiff's tactics (which a rational juror could view as intentionally calculated to generate a misunderstanding) and of Defendants' conduct in cashing the check without reading the cover letter (which a rational juror could view as negligent) and thereafter retaining the proceeds.  Even though the basic facts are largely undisputed, the inferences to be drawn from those facts are hotly—and genuinely— disputed.  Defendants are not entitled to summary judgment under these circumstances. *Fresno Motors*, 771 F.3d at 1125 ("Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts.").

Finally, to the extent it is also necessary to consider § 20 of the Restatement (Second) of Contracts in resolving the parties' dispute over § 19(2) and mutual assent,[14] the provision further supports the conclusion that summary judgment must be denied here. Section 20, which is entitled "Effect of Misunderstanding," provides:

> (1)   There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and
>
>> (a)   neither party knows or has reason to know the meaning attached by the other; or

---

[14]   Comment a to § 20 explains that "Subsection (1) states the implications of the rule of § 19(2) as to the meaning of 'manifestation of mutual assent' in cases of mistake in the expression of assent."

(b)   each party knows or each party has reason to know the meaning attached by the other.

(2)   The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if

(a)   that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or

(b)   that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

*Id.*

Turning to § 20(1), the first part of this test is easily satisfied here—the undisputed evidence establishes that the parties subjectively "attach[ed] materially different meanings to their manifestations," as Plaintiff thought it had reached a settlement while Defendants merely thought they were processing a mortgage payment.  The real dispute, again, is over whether each side had "reason to know" about the other side's understanding.  As to that issue, comment b to § 20 explains that "[t]he meaning given to words or other conduct depends to a varying extent on the context and on the prior experience of the parties. . . . [M]aterial differences of meaning are a standard cause of contract disputes, and the decision of such disputes necessarily requires interpretation of the language and other conduct of the parties in the light of the circumstances."  As with the dispute over "reason to know" for § 19(2) purposes, the Court construes these considerations as raising legitimate factual disputes that cannot be resolved in either side's favor at summary judgment.  *Fresno Motors*, 771 F.3d at 1125.

II.   Plaintiff's Motion For Summary Judgment

Broadly, Plaintiff argues it is entitled to summary judgment for three reasons: (1) the parties entered into an express contract by the writing of the March 2021 letter and the written endorsement of the check; (2) the parties entered into an implied contract through the March 2021 letter and the performance of depositing the check and/or retaining the

check proceeds for 23 months; and (3) specific performance of the contract is the required remedy because Plaintiff cannot maintain a quiet title action "as it lacks an interest in the Property."  (Doc. 48 at 11-16.)

In response, Defendants reiterate the arguments set forth in their affirmative motion for summary judgment and identify two additional reasons—unilateral mistake and unconscionability—why Plaintiff's motion should be denied.   (Doc. 52 at 5-15.) Defendants also question whether Plaintiff is entitled to specific performance and contend that the only appropriate remedy is recission and return of the $10,000.  (*Id*. at 15-17.)

In reply, Plaintiff argues, *inter alia*, that mutual assent "is not required for an implied contract"; that Defendants' unilateral-mistake theory impermissibly shifts the risk to Plaintiff; that Defendants have offered no evidence that Plaintiff's counsel understood the April 5 or April 30 letters as a rejection or that "the address was chosen in bad faith to trick SPS"; and that the sophisticated nature of the parties undermines Defendants' unconscionability arguments.  (*See generally* Doc. 56.)

Plaintiff's request for summary judgment is denied.   Contrary to Plaintiff's suggestion, a meeting of the minds (*i.e.*, mutual assent) is required for both an express and implied contract.  *Pyeatte v. Pyeatte*, 661 P.2d 196, 202 (Ariz. Ct. App. 1982) ("Contracts consist of an offer, acceptance, consideration, and intent by the parties to be bound by the contract. . . . An implied-in-fact contract is a true contract, differing from an express contract only insofar as it is proved by circumstantial evidence rather than by express written or oral terms."); *id.* at 203 ("To support her claim for restitution on the basis of an implied-in-fact contract, appellee must demonstrate the elements of a binding contract."). And as explained in Part I.B.2 above, the question of mutual assent presents a jury issue in this case.  Just as the Court could not resolve this issue in Defendants' favor in relation to their affirmative summary judgment motion, the Court cannot resolve it in Plaintiff's favor in relation to Plaintiff's affirmative motion.   This conclusion makes it unnecessary to address Defendants' other theories for opposing summary judgment on the contract-formation issue.  *See* Restatement (Second) of Contracts § 19, cmt. d ("[T]he fact that

apparent assent is not genuine may have legal significance in rendering the contract voidable or unenforceable for mistake . . . .  Where there is no manifestation of mutual assent, on the other hand, the contractual relations of the parties are not affected, and such inquiries are unnecessary.").  Finally, because Plaintiff has not conclusively established the existence of a valid contract, it is unnecessary to address the parties' arguments regarding the availability of specific performance as a potential remedy for the breach of that contract. *See, e.g.*, *Shreeve v. Greer*, 173 P.2d 641, 644  (Ariz. 1946) ("Specific performance . . . is available when there exists [among other things] [a] valid binding contract . . . ."); *Gable v. Miller*, 104 So.2d 358, 360 (Fla. 1958) ("It is fundamental that a prerequisite of a decree for specific performance is the existence of a valid contract.") (citation omitted).

III.   Attorneys' Fees

Defendants request an award of attorneys' fees and costs.  (Doc. 47 at 17.)  This request is governed by A.R.S. § 12-341.01, which provides that "[i]n any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees."  Here, because there is not yet any successful party, Defendants' request is premature.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 47) and Plaintiff's motion for summary judgment (Doc. 48) are **denied**.

**IT IS FURTHER ORDERED** that Defendants may, within 30 days of the issuance of this order, file a successive summary judgment motion limited to the issue of preemption.

Dated this 16th day of August, 2023.

Dominic W. Lanza
United States District Judge